BALDWIN et al. v. GRIER BROS. CO.

(District Court, W. D. Pennsylvania. July 7, 1914.)

No. 26.

1. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNFAIR COMPETITION—MINER'S LAMP.

A defendant held chargeable with unfair competition in making and selling a miner's acetylene lamp in imitation of complainant's, which was the first of its kind in the market, defendant's being very similar in appearance, packed and sold in similar boxes, and having practically the same attachments and reading matter inclosed.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. § 70.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—MINER'S ACETYLENE LAMP.

The Baldwin reissue patent, No. 13,542 (original No. 821,580), for a miner's acetylene lamp, claim 4, as made more specific by the reissue to conform more closely to the original specification, was not anticipated, and discloses patentable invention; also held infringed.

In Equity. Suit by Frederick E. Baldwin and the John Simmons Company against the Grier Bros. Company. On final hearing. Decree for complainant.

See, also, 210 Fed. 560.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Wesley G. Carr, of Pittsburgh, Pa. (James Q. Rice, of New York City, of counsel), for plaintiffs.

Jos. M. Nesbit and Brown & Stewart, all of Pittsburgh, Pa., for defendant.

ORR, District Judge. The plaintiffs by their bill charge the defendant with infringement of reissue patent of the United States, No. 13,542, issued to Frederick E. Baldwin for an acetylene gas generating lamp under date of March 11, 1913, and have also charged the defendant with unfair competition in trade in marketing an unfair copy of a portable miner's acetylene lamp known as the "Baldwin" lamp. The defendant has denied the validity of the patent, upon the ground, as it alleges in the answer, that the said reissue patent and the original patent No. 821,580 were fully anticipated in the prior art, and defendant denies that it has been at all unfair in its competition with the plaintiff in marketing a portable miner's acetylene lamp manufactured by it.

[1] Taking up first the question of unfair competition, the court has reached the conclusion that the facts and law are with the plaintiff. This branch of the case was before the late Judge Young upon a motion for a preliminary injunction, which motion was sustained in an opinion filed by him on January 3, 1914. That the conclusions reached by that learned judge were correct appears clearly from the evidence produced at the trial. Some time prior to January 21, 1906, on which date there appeared in the Engineering and Mining Journal a description of the Baldwin lamp, the plaintiff, Frederick E. Baldwin, began to put out a miner's acetylene cap lamp substantially like the lamp of the plaintiffs. At or about that time he entered into business relations with the other plaintiff, whereby the latter acquired the sole right to manufacture the said lamp in consideration of a royalty upon each lamp paid and to be paid to the former. There was difficulty in introducing the lamp to the intended users. Miners were not familiar with acetylene, and had to be taught its uses. Miners supply stores did not carry calcium carbid. The carbid on the market was usually in lumps too large for use in a cap lamp, and in some states mining inspectors would not permit the use of acetylene lamps in the mines. These difficulties, however, appear to have been largely, if not wholly, overcome in mines where safety lamps are not required, and the plaintiffs have sold the Baldwin lamp to the number of 900,000 or thereabouts. The Baldwin lamp was packed in a pasteboard box with an extra carbid container to be substituted for the container on the lamp when the carbid therein would be exhausted, and equipped also with a wire for the purpose of cleaning the small opening of the gas burner, which wire was attached to a flat piece of metal of singular shape with a hole through it which could be hung upon any one of certain metal hooks or braces with which the lamp was equipped and intended to be used for suspending and steadying the lamp against the cap. In the box with the lamp and the extra carbid container and the cleanser was a circular, containing printed instructions to users in four or five different languages. Some time in the early part or in the middle of the year 1913, the defendant began the manufacture and sale of its

lamp, called herein the "Grier" lamp. That lamp was designed to imitate the Baldwin lamp. This conclusion cannot be resisted from a careful consideration of the testimony and of the exhibits. It is similar in design. It was packed in a similar box. It contained the extra carbid container. It contained the cleanser, even with the piece of metal attached thereto, with a hole in it, and it contained an almost verbatim copy of the circular which accompanied the Baldwin lamps. It is a fact that the box containing the Grier lamp has not the same printing upon it the Baldwin box had, and it is true that there appears stamped in the brass which forms part of the top of the Grier lamp the name "Grier Brothers, Pittsburgh, Pa.," with a star, yet such stamping is on the same part of the lamp as the stamping of the Baldwin lamp. These variations are not sufficient to relieve the defendant from the charge of unfair competition. The defendant also has attached to the reflector of its lamp a small apparatus called a sparker, which will throw a spark and light the lamp. But this sparker is a removable adjunct to the lamp, and does not give sufficient identity to the defendant's lamp to avoid deception. Defendant says that its lamp is sold, not because of its imitation of the Baldwin lamp, but because of the addition of the sparker. The fact is found to be that the sparker, while it may be a factor in inducing the purchase of the Grier lamp, yet it is not the chief cause. It is the general similarity of the Grier lamp to the Baldwin lamp, in connection with a knowledge of and experience with the Baldwin lamp, prior to the introduction of the Grier lamp, that is the factor in making the sales of the defendant's product. Defendant insists that the reasons for the similarity of appearance are inherent in the nature of the article, or in the necessary, convenient, or mechanical methods and processes of manufacture. I cannot so find the fact to be. The mere facts that a miner's lamp must be light enough to be carried upon the cap of the miner; that it must be short enough to escape the roof of the mine; that brass is a light material and resists the action of the mine waters; that a reflector will more easily fit in against the side of an inverted cone than against some other shape, are not sufficient to destroy the plaintiffs' rights to the fruits of their labor, in the introduction of their lamp.

Defendant offered the record of a suit instituted by the said Baldwin against one Jacob Bleser in the Circuit Court of the United States for the Southern District of Illinois, wherein the question of unfair competition, as well as the validity of patent No. 821,580, were both involved, and in which there was a decision that the defendant Bleser had not been guilty of unfair competition, and defendant offered evidence of the similarity of Bleser's lamp with the lamp of the plaintiffs in the case at bar. This case will be referred to later in the consideration of the question of infringement. As the court regards it, however, it has no bearing upon the question of unfair competition in the case at bar. Even if Bleser was not guilty of unfair competition, and even if his acts were the same as those of the defendant in the case at bar, yet Bleser's release from liability would not afford protection to the defendant here. However, it does not appear that Bleser was guilty of the same acts of which the defendant has been shown to be guilty

in this case. The charge of unfair competition in that case, although raised, may not have been sufficiently pressed. In every aspect of the case at bar, after a careful consideration of the evidence and arguments, the court finds as a fact that the defendant has been and is guilty of unfair competition and should be restrained by injunction.

[2] The other questions in the case are not without difficulty. There is nothing new in the use of acetylene gas as an illuminant in portable or stationary burners. As is well known, it is a gas liberated by the addition of water and calcium carbid. The difficulty in the art has always been to regulate the flow of water to the carbid so that there will not be a greater amount of gas liberated by the chemical action than is required for use. In portable lamps especially it is evident that there must be due consideration given to the weight of the lamp with its contents and as well some proper relation between the amount of water and carbid to insure a flame sufficiently long to make the lamp of practical use. In a miner's lamp especially, because it is attached to the cap of the miner, especial consideration must be given to its size and weight. From the foregoing, it is apparent, without reference to the prior art, that there must be in every portable lamp a water chamber, a carbid container, and a means for controlling the flow of water from the former to the latter, just as surely as there must be the generation of gas and the flame. The greatest difficulty in the art, so far as appears in the record of this case, has been to regulate the flow of water. Such regulation appears to have been most successfully accomplished by means of a tube through which the water flows, in connection with which, or adjacent to an end of which, some means have been adopted for restraining the flow. This regulation has usually been accomplished by means of a valve which could be pressed against an end of the tube. This appears in United States patent to Handshy, No. 591,132, wherein the valve closes the tube automatically as the pressure of the gas beneath the water retort raised the diaphragm separating the two, thereby cutting off the flow of water until the use of the gas in the retort so diminished the pressure as to permit the diaphragm to fall and allow more water to enter the carbid. In some patents the valve was operated by hand, so that as the flame increased too much the operator would seat the valve in the opening in the tube, thereby shutting off the water until the flame had become reduced, and when the flame became too low, the valve could be slightly lifted from its seat and water allowed to flow through the tube into the carbid. This is seen in United States patent to Frederick E. Baldwin, No. 656,874, dated August 28, 1900. In most of the prior patents a wire or rod extended through the tube, and upon this rod the valve was fastened. This rod in many of the lamps of the prior art was capable of being moved up and down, and as well in some cases rotated for the purpose of removing from the tube articles that might have passed therein from the water or the small particles of slaked carbid that might have gotten into the tube in the generation of gas.

The plaintiff, Frederick E. Baldwin, on the 15th of July, 1903, applied for a patent for an acetylene gas generating lamp, and was awarded one by the United States on May 22, 1906, the same being numbered

821,580. It is the reissue of this patent that is in suit. In the original patent the inventor, after reciting the difficulties of regulating the flow of water and the methods adopted in the prior art, states his method to be as follows:

"The method which I have invented for securing the proper feed under all circumstances without the above objectionable features is to make the bore of the duct of comparatively large size and then restrict it by means of a wire or rod preferably centrally located therein to leave a channel of the proper size. This arrangement is simple; but in a long experience it has been found to be entirely successful. It is possible to secure the correct drop-by-drop feed with a duct of considerable size, since the friction of the water on the large area of the tube-wall and wire reduces its flow. This retarding-friction may be regulated by varying the size of wire used. The duct does not become choked, since if foreign particles are deposited therein the water can take a zigzag course around it without the supply being appreciably affected. If it is at any time necessary to clean the tube, the wire is simply reciprocated and rotated a few times from the outside of the lamp without disturbing the position of other parts. This nice regulation of the flow enables me to entirely dispense with the troublesome adjustment of the valve. If a valve is used at all, it is employed to shut off the flow entirely and not to regulate it."

The special feature set forth in that quotation from the specifications is not made prominent in any of the claims of the patent. As we propose to deal entirely with the fourth claim of the patent in suit, the fourth claim of the original patent is set forth as follows:

"4. In a lamp of the kind described, the combination with a water-reservoir, and a receptacle for calcium carbid, of a water-tube extending from the former a considerable distance into the latter and adapted to be embedded in the mass of carbid in the receptacle, and a rod extending through the water-tube and constituting a stirrer to break up slaked carbid around the outlet of the water-tube, as set forth."

The words "as set forth," at the close of that claim would seem to be a reference to the special feature in the specifications as disclosed. This special feature does not appear to have been fully considered in the case of Bleser v. Baldwin, 199 Fed. 133, 117 C. C. A. 615, wherein there was an adjudication adverse to the plaintiff as to claim 4 of patent No. 821,580. That case, so far as claim 4 is concerned, seems to have dealt principally with the rod as a stirrer and not as a factor in creating retarding friction in the water-tube. The patent to Bleser, as found by the court in that case, "calls for a needle fitting loosely into the tube and other hollow parts of which it constitutes the core. Its function is 'to clean the tube 4 and remove any obstruction from the end thereof.'" After the decision in Bleser v. Baldwin, supra, the plaintiff Baldwin applied for a reissue of his patent No. 821,580. He changed that portion of his specifications which has been above quoted by adding the underscored words in the following quotation:

"The method which I have invented for securing the proper feed under all circumstances without the above objectionable features is to make the bore of the duct of comparatively large size *extend the tube which forms the duct downward so that its end will be always embedded in the carbid,* and then restrict the duct by means of a wire or rod preferably centrally located therein to leave a channel of the proper size. This arrangement is simple; but in a long experience it has been found to be entirely successful. It is possible to secure the correct drop-by-drop feed with a duct of considerable

size, since the friction of the water on the large area of the tube-wall and wire reduces its flow. This retarding-friction may be regulated by varying the size of the wire used. The duct does not become choked, since if foreign particles are deposited therein the water can take a zigzag course around it without the supply being appreciably affected. If it is at any time necessary to clean the tube, the wire is simply reciprocated and rotated a few times from the outside of the lamp without disturbing the position of other parts. This nice regulation of the flow enables me to entirely dispense with the troublesome adjustment of the valve. If a valve is used at all, it is employed to shut off the flow entirely and not to regulate it."

He also inserted the following in the specifications:

"It will be understood from what has been said that the function of the stirrer is to break up, pierce, or disturb the particles of the slaked carbid mass which, when the lamp is in use, forms at the delivery end of the tube. This slaked carbid mass tends to solidify and either shuts the water off altogether or restricts it so that less water is delivered from the water tube than the lamp demands for efficient operation. As it is sufficient, under cer-- tain circumstances, to insure the requisite water flow by so manipulating the stirrer as to pierce, break up, or loosen the slaked carbid mass immediately around or at the mouth of the tube, it is obvious that the stirrer need not always be formed with a bent end, or so as to extend radially from the mouth of the tube."

He also rewrote claim 4 by adding the words underscored in the following reprint:

"4. In a lamp of the kind described, the combination with a water-reservoir, and a receptacle for calcium carbid, of a water-tube extending from the former a considerable distance into the latter and adapted to be embedded in the mass of carbid in the receptacle, and a rod extending through the water-tube, and constituting a stirrer to break up slaked carbid around the outlet of the water-tube, *the rod operating to restrict and thus control the flow of water to the carbid*, as set forth."

Thus it will be seen that what this court believes to have been the special feature of the original patent is more clearly and definitely set forth in the reissue. It is made plain that the tube must be of such length as to be always embedded in the carbid, and that the rod extending through the same must be such as would operate to restrict and control the flow of water. The large-sized area of the tube, and as well the length of the tube in relation to the rod placed therein, has the effect of increasing the friction of the water and thereby retarding its flow. There is no suggestion in any of the prior patents that the flow of water may be regulated in this way. All the other elements of the fourth claim are old, but the combination of such old elements with the rod of a proper size for the restriction and control of the flow of the water is new. That it was useful appears from the extended use to which it has been and is being put. Plaintiffs are therefore entitled to be protected because the patent discloses invention.

But it is said that the plaintiff Baldwin was not entitled to the reissue because the claim is broadened and not narrowed. Claim 4 of the original patent was an exceedingly broad claim when read without reference to the special feature of the specifications found in the excerpt above quoted. The rod called for by the claim might have been any kind of a rod, provided it extended through the water-tube and could be used to break up slaked carbid around the edge of the tube.

In the claim of the reissue patent it cannot be any kind of a rod, but is limited to a rod of such size with respect to the tube that it will restrict and control the flow of water through the same.

The defendant has invoked the doctrine of intervening rights as a defense to the suit upon the reissue. The final decision of the Bleser Case appears to have been entered April 23, 1912. The application for reissue was filed February 5, 1913. As above stated, claim 4 of the patent was narrowed by the reissue. The reissue in the light of the Bleser Case was perhaps reasonably necessary and proper. The court is unable to find from the testimony that there were any intervening rights. The reissue, therefore, in so far as claim 4 is concerned, is valid. Because the lamp of the defendant possesses all the elements found in claim 4, and especially because it has a water-tube extending a considerable distance into the calcium carbid and adapted to be embedded in the mass of carbid, and a rod extending through the water-tube, not only constituting a means of breaking up slaked carbid around the outlet of the tube, but operating to restrict and control the flow of water to the carbid, the defendant has infringed plaintiffs' rights under the patent, and an injunction should issue to restrain further infringement thereof.

In thus disposing of this case, the court has limited itself to a consideration of the principal questions, without going into details, which are readily found from a large mass of testimony and numerous exhibits. Further elaboration seems wholly unnecessary.

Let a decree be presented in accordance with this opinion.